Robert V. Prongay (SBN 270796)
Charles H. Linehan (SBN 307439)
Pavithra Rajesh (SBN 323055)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Attorneys for Plaintiff Paula Earley*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAULA EARLEY, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>WRAP TECHNOLOGIES, INC., DAVID NORRIS, THOMAS SMITH, JAMES A. BARNES, MIKE ROTHANS, and MARC THOMAS,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

Plaintiff Paula Earley ("Plaintiff"), individually and on behalf of all others similarly situated, by and through her attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, her counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Wrap Technologies, Inc. ("Wrap" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Wrap; and (c) review of other publicly available information concerning Wrap.

## NATURE OF THE ACTION AND OVERVIEW

1.     This is a class action on behalf of persons and entities that purchased or otherwise acquired Wrap securities between April 29, 2020 and September 23, 2020, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Wrap is a security technology company whose sole product is the BolaWrap, a remote restraint device.

3.     In December 2019, the Company announced that the Los Angeles Police Department ("LAPD") would train its officers on the BolaWrap and deploy 200 devices in the field for a 90-day pilot program beginning in January 2020.

4.     On July 22, 2020, White Diamond Research published a report alleging that the BolaWrap had limited use in the field and therefore Wrap has a very small total addressable market. The report also alleged that it was likely Wrap did not secure a contract with the LAPD.

5.     On this news, the Company's share price fell $0.55, or 4.6%, to close at $11.34 per share on July 22, 2020, on unusually heavy trading volume.

6.     On August 25, 2020, after the market closed, an article by *Los Angeles Times* reported that "[s]ince the initial 180-day pilot began in February, LAPD

CLASS ACTION COMPLAINT

officers have used the BolaWrap a total of nine times[, and it] was deemed 'effective' in six instances." As a result, the LAPD sought a 180-day extension to continue evaluating the device.

7. On this news, the Company's share price fell $0.50, or 5.7%, to close at $8.27 per share on August 27, 2020, on unusually heavy trading volume.

8. On September 23, 2020, White Diamond Research published a second report, alleging that, despite previously touting the LAPD pilot program, Wrap failed to disclose the key findings from the initial 180-day testing period because it was "bad news." The report described the nine incidents in which the BolaWrap had been used, thereby highlighting its limited utility.

9. On this news, the Company's share price fell $2.07, or 25%, close at $6.07 per share on September 23, 2020, thereby damaging investors.

10. Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that there were limited instances in which Wrap's BolaWrap could potentially be used because it requires a minimum of 10 feet between the officer and the suspect; (2) that, as a result, the BolaWrap was reasonably unlikely to be effective in most situations; (3) that the LAPD sought extensions of the pilot program because they needed a larger sample size to assess the effectiveness of the BolaWrap; (4) that the LAPD had not found the BolaWrap to be useful or effective during its pilot program; (5) that, as a result, Wrap had not received positive feedback from the LAPD about the BolaWrap and therefore it was unlikely that the Company would secure a sizeable contract with the LAPD; and (6) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

CLASS ACTION COMPLAINT

11.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

14.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

15.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

16.     Plaintiff Paula Earley, as set forth in the accompanying certification, incorporated by reference herein, purchased Wrap securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

17.     Defendant Wrap is incorporated under the laws of Delaware with its principal executive offices located in Tempe, Arizona. Wrap's common stock trades on the NASDAQ exchange under the symbol "WRTC."

CLASS ACTION COMPLAINT

18.    Defendant David Norris ("Norris") was the Company's Chief Executive Officer ("CEO") from December 2018 to July 30, 2020.

19.    Defendant Thomas Smith ("Smith") was the Company's President at all relevant times.

20.    Defendant James A. Barnes ("Barnes") was the Company's Chief Financial Officer ("CFO") at all relevant times.

21.    Defendant Mike Rothans ("Rothans") was the Company's Chief Operating Officer at all relevant times.

22.    Defendant Marc Thomas ("Thomas") has been the Company's CEO since July 30, 2020.

23.    Defendants Norris, Smith, Barnes, Rothans, and Thomas (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

24.    Wrap is a security technology company whose sole product is the BolaWrap, a remote restraint device.

CLASS ACTION COMPLAINT

25.     In December 2019, the Company announced that the LAPD would train its officers on the BolaWrap and deploy 200 devices in the field for a 90 day pilot program beginning in January 2020.

**Materially False and Misleading**
**<u>Statements Issued During the Class Period</u>**

26.     The Class Period begins on April 29, 2020. On that day, Wrap announced its first quarter 2020 financial results in a press release that stated, in relevant part:

**First Quarter and Recent Operational Highlights**:

- In February, began field testing BolaWrap with hundreds of officers in the Los Angeles Police Department (LAPD), the third largest police department in the U.S. with more than 9,000 sworn officers

- Received new orders for BolaWraps from police agencies in California, Missouri, Illinois, Virginia, Louisiana, Maryland, Minnesota, and Washington during March 2020

- Shipped international purchase orders for 200 BolaWraps and 2,000 cartridges and accessories

- Q1 international shipments raise the total countries receiving BolaWrap products to 19

27.     The same day, Wrap held a conference call with investors and analysts to discuss the reported first quarter 2020 financial results. During the call, the Company and its executives stated that the LAPD had extended its field trial, purportedly due to complications caused by coronavirus. Specifically, defendant Smith stated:

> As many of you are aware, LAPD began field testing the BolaWrap in February of this year. 200 BolaWraps have been circulating among approximately 1,100 trained officers throughout L.A. City. As of today, they are a little over two-thirds of the way through their original 90-day trial period, however given what the complications the department has faced from the coronavirus, we expect that they will likely extend the field trial and we will be more than happy to continue to support the department.

28.     Similarly, defendant Rothans stated:

> Many agencies across the U.S. are only responding to emergency calls and not routine calls, which means as supposedly being proactive and maybe encountering somebody self initiated activities for somebody that's suffering from mental health crisis, somebody under the influence,

5

CLASS ACTION COMPLAINT

1    now they're encouraged to stay away from that individual. So, that does
2    limit the use and we've actually seen that in LAPD's trial, but this
     of course is a limited period of time.

3    29.    The above statements identified in ¶¶ 26-28 were materially false and/or

4    misleading, and failed to disclose material adverse facts about the Company's

5    business, operations, and prospects.    Specifically, Defendants failed to disclose to

6    investors: (1) that there were limited instances in which Wrap's BolaWrap could

7    potentially be used because it requires a minimum of 10 feet between the officer and

8    the suspect; (2) that, as a result, the BolaWrap was reasonably unlikely to be effective

9    in most situations; (3) that the LAPD sought extensions of the pilot program because

10   they needed a larger sample size to assess the effectiveness of the BolaWrap; and (4)

11   that, as a result of the foregoing, Defendants' positive statements about the

12   Company's business, operations, and prospects were materially misleading and/or

13   lacked a reasonable basis.

14   30.    The truth began to emerge on July 22, 2020 when White Diamond

15   Research published a report alleging that the BolaWrap had limited use in the field

16   and therefore Wrap has a very small total addressable market. In a report entitled

17   "Wrap Technologies Batman Device is Mostly Impractical in the Real World - $3

18   Price Target," White Diamond Research stated, in relevant part:

19       [T]he BolaWrap is an impractical device with a limited use-case for law
20       enforcement. As the tether extends 8 feet when fired, it requires at least
         4 feet on either side of the target to extend properly, and a minimum of
         10 feet of further separation between the officer and the target.
21
                              *       *       *
22
23       We've spoken with many police officers asking if they would ever use
         the BolaWrap. Many have told us that using this device would be in such
         rare situations, that it would be hard to use.
24
25       The only plausible application of the device appears to be during street
         stops. Which are when a police officer stops a citizen on the street to ask
26       questions or ask to conduct a search. According to the US Department
         of Justice . . . only ~1.0% of police to public contact takes place during
27       street stops. Even more extreme, is that only 4.1% . . . of the altercations
         typically lead to an arrest. And this is further narrowed by the
28       subsegment already being served by many other devices.

---

6

CLASS ACTION COMPLAINT

1

\*     \*     \*

2        BolaWrap's TAM (Total Addressable Market) is very small. Lots of
3        space is needed to successfully execute the device. . . . Most importantly, the device is only being marketed for the use on the mentally ill . . . .

4        The combination of both a limited target market and the device's
5        impracticality in most environments points to a significant limitation for the TAM. With most mental health episodes taking place domestically,
6        police department demand and resulting sales are likely to remain constrained.

7        31.    Moreover, the report alleged that it was likely Wrap did not secure a

8 contract with the LAPD. Specifically, it stated:

9        The Los Angeles Police Department ("LAPD") started a 90 day field
10       trial with the BolaWrap in February of this year. At the time, this was a big deal, and was parroted a lot in the media in December/January right
11       before the field trial. However, after January, the BolaWrap hasn't been mentioned by the media with respect to the LAPD.

12

\*     \*     \*

13       At this point, it has been three months since WRTC's earnings call where
14       Smith said the LAPD field trial is two-thirds finished. If the LAPD really felt a strong need for it, we believe the deal would have been announced
15       by now. Since it hasn't been announced, then the clear implication is that it appears that LAPD decided not to make the purchase, or at least one
16       that matters.

17        32.    On this news, the Company's share price fell $0.55, or 4.6%, to close at

18 $11.34 per share on July 22, 2020, on unusually heavy trading volume.

19        33.    On July 30, 2020, Wrap held a conference call with investors and

20 analysts to discuss the second quarter 2020 financial results. During the call,

21 defendant Norris assured that the "LAPD trained about 1,100 officers and they do

22 have 200 devices in the field 24 hours a day with those 1,100 officers."

23        34.    During the same call, defendant Smith claimed that Wrap "continued to

24 receive positive feedback from the LAPD," which had sought extensions for the field

25 testing program purportedly because they "like[d] the product." Specifically, he

26 stated, in relevant part:

27

28

---

7

CLASS ACTION COMPLAINT

There is one large department within the U.S. that we've been undergoing trials with and that is the Los Angeles Police Department.

When this program first started, we initially thought that the trial period would last approximately 90 days. However, with optional extensions – periods built in the agreement, some of which have already been exercised. There was the potential for this trial to last for upwards of one year. Bear in mind, those terms were discussed before the Coronavirus began to impact the U.S. in earnest and therefore, they are subject to change.

The current extension is set to end in August, but it is possible and most likely we will see another extension exercised. I am fully aware that humans are risk adverse beings. And so, there is a natural tendency to fill the void left by uncertainty with negative speculations. So, let me try to put some of those at ease. Extensions are a very good thing.

***If LAPD didn't like the product, they wouldn't be asking for extensions, and we have continued to receive positive feedback from them.***

To conduct this trial, LAPD had to train 1,100 officers on the BolaWrap. They committed approximately 8,800 hours to training which is equivalent to four man years that's a massive investment on their part. The opportunity cost of pulling that many officers out of rotation and into training should not be discounted. They've committed substantial resources towards this project. So rest assured they are spending the time that they believe is adequate to give the BolaWrap an honest and thorough evaluation.

35.     The above statements identified in ¶¶ 33-34 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that there were limited instances in which Wrap's BolaWrap could potentially be used because it requires a minimum of 10 feet between the officer and the suspect; (2) that, as a result, the BolaWrap was reasonably unlikely to be effective in most situations; (3) that the LAPD sought extensions of the pilot program because they needed a larger sample size to assess the effectiveness of the BolaWrap; (4) that the LAPD had not found the BolaWrap to be useful or effective during its 180-day pilot program; (5) that, as a result, Wrap had not received positive feedback from the LAPD about the BolaWrap and therefore it was unlikely that the Company would secure a sizeable contract with the LAPD; and (6) that, as a result of the foregoing,

CLASS ACTION COMPLAINT

Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

36.     The truth continued to emerge on August 25, 2020 after the market closed when *Los Angeles Times* reported that the LAPD sought a 180-day extension of the program to continue evaluating the device. The article, entitled "LAPD will keep testing BolaWrap, a device meant to immobilize suspects from a distance," stated:

> Los Angeles police will continue testing a tether restraint designed to help immobilize suspects from a distance — known as the BolaWrap — after an initial six-month pilot program produced too little data to gauge the tool's overall effectiveness.
>
> At the department's request, the Police Commission unanimously granted a 180-day extension to the program during its meeting Tuesday morning.
>
> Since the initial 180-day pilot began in February, LAPD officers have used the BolaWrap a total of nine times. It was deemed "effective" in six instances.
>
> According to an LAPD report on those incidents provided to the commission, successful deployments helped take various suspects into custody, including a naked man running through traffic, a suspect wielding a pipe, a suspect with a knife, and an arson suspect.
>
> The devices were ineffective in one incident in which a suspect was up against a fence, in another where a suspect wore a very a large, bulky coat, and another in which the officer who fired the tether missed the suspect, the report said.
>
> Deputy Chief Martin Baeza told the commission that the department hoped to gather data from more deployments in the coming months to help determine whether to keep using the BolaWrap.
>
> He said the devices were meant to assist officers in bringing potentially dangerous situations to an end without using more deadly force, and that he remained optimistic they could serve that purpose.
>
> Baeza said the LAPD was also working with the manufacturer of the BolaWrap, which provided 200 devices for testing, to see if improvements might be made to make the devices more effective.

37.     On this news, the Company's share price fell $0.50, or 5.7%, to close at $8.27 per share on August 27, 2020, on unusually heavy trading volume.

CLASS ACTION COMPLAINT

38.     On September 3, 2020, Wrap participated in the LD 500 Virtual Conference. During the presentation, defendant Smith stated, in relevant part:

> We're used in over 210 agencies around the United States, the largest being so far the Los Angeles Police Department, or LAPD. They've trained 1,100 officers and have over 200 devices out on the street. They are about halfway through their field trial, they'll be wrapping that up in early February of next year. ***And so far they've had great feedback from the officers and their uses so far.***

39.     On September 9, 2020, Wrap participated at the 9th Annual Gateway Conference, during which defendant Smith made substantially similar statements as identified in ¶ 38.

40.     The above statements identified in ¶¶ 38-39 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that there were limited instances in which Wrap's BolaWrap could potentially be used because it requires a minimum of 10 feet between the officer and the suspect; (2) that, as a result, the BolaWrap was reasonably unlikely to be effective in most situations; (3) that the LAPD sought extensions of the pilot program because they needed a larger sample size to assess the effectiveness of the BolaWrap; (4) that the LAPD had not found the BolaWrap to be useful or effective during its 180-day pilot program; (5) that, as a result, Wrap had not received positive feedback from the LAPD about the BolaWrap and therefore it was unlikely that the Company would secure a sizeable contract with the LAPD; and (6) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

### Disclosures at the End of the Class Period

41.     On September 23, 2020, White Diamond Research published a report entitled "Wrap Technologies: Disastrous LAPD BolaWrap Pilot Program Results, No Evidence These Have Been Communicated to Investors." The report alleged that, despite previously touting the LAPD pilot program, Wrap failed to disclose the key

CLASS ACTION COMPLAINT

findings from the initial 180-day testing period because it was "bad news." Specifically, the report stated, in relevant part:

> The company's management has seemingly failed to disclose, however, a key milestone failure from an LAPD report filed after the six-month trial program finished on 8/25/20. We found this report through our continued research on the company. There isn't any evidence that company executives have referenced or mentioned the LAPD report. This is the only comprehensive in-field study that has been done on the BolaWrap. So why haven't the results been released to investors? It's bad news.

> Over a six-month period, 200 BolaWrap devices in the hands of 1,100 LAPD officers in the field were only used nine times, and only worked once. On an annualized basis, this comes to each BolaWrap is only used 0.09 times per year. Or, once every 11 years. At least 191 BolaWraps weren't used at all in the pilot program, they were just sitting there collecting dust. We believe this was about the worst result that could've happened from the program. The only way it could've been worse, is if the BolaWrap didn't work at all.

42. The report described the nine incidents in which the BolaWrap had been used, thereby highlighting its limited utility. It stated, in relevant part:

> The nine incidents of utilization are described in the report. It says that the number of incidents where the device was effective was six times. But looking at it closely, the BolaWrap did what it's supposed to do, as shown in the WRTC demonstration videos, only once.

> Analyzing each of the incidents:

> 1. A naked man was running in and out of traffic. The BolaWrap was deployed, it hit him in the legs but didn't wrap. This made the suspect take a fighting stance. An officer deployed his baton on the suspect, and he was taken into custody without further incident. This incident is marked as "effective" but it really wasn't. It didn't wrap around and disable the suspect but in fact made him more hostile as he took a fighting stance. The officer had to use force with his baton, which could've been used without the BolaWrap and likely end up with the same result.

> 2. A call came in to report a male with a mental illness. The BolaWrap wrapped around the suspect but he was wearing a "puffy jacket" and he immediately pulled his arms free. This incident was marked "ineffective".

> 3. A call came in to report an ADW (Assault with a Deadly Weapon) suspect. Officers observed the suspect with a pipe in his hands. The officers told the suspect to drop it, but he wouldn't comply. First, the 40mm Less-Lethal Launcher was used to strike the suspect but had no effect. Then the BolaWrap was deployed at the suspect's legs. It didn't wrap around his legs, but the suspect immediately complied afterwards. This incident was marked

"effective" because no additional force was needed after the BolaWrap was deployed. But again, it wasn't really effective because it didn't do what it's supposed to do, which is wrap around a suspect.

4. A call came in to report an ADW suspect with a knife. The suspect failed to comply with officers' commands. The BolaWrap was deployed at the suspect's legs and successfully wrapped around him, stopping his advancement. This was the only time out of these nine utilizations that the BolaWrap successfully "wrapped" a suspect.

5. Officers were in pursuit of a suspect. The BolaWrap was shot at the suspect's legs. Again, it didn't wrap around the suspect's legs, but it startled the suspect and he was taken into custody. This was marked "effective", but in our opinion it wasn't. Again, the BolaWrap didn't work like it's supposed to - it didn't wrap.

6. A man was disturbing the peace. The BolaWrap was deployed at the suspect's legs. It hit the suspect's legs but didn't wrap around it completely, and he stepped out of the tether. The officers then utilized a team takedown to take the suspect into custody. This was marked "effective" as it stopped the suspect from walking away. This is more effective than the other times, because he had to actually step out of the tether, which slowed him down. But still, it didn't wrap completely around his legs.

7. A call came in of an arson suspect. The BolaWrap was deployed at the suspect's legs, it hit him in the knee but didn't wrap. He was stunned by the impact, and was taken into custody without further incident. Because there wasn't further incident, it was marked effective, but in reality it was another fail.

8. A call came in of a family dispute. The suspect was armed with a large stick. The BolaWrap was shot at his arms, but didn't wrap, possibly because it hit a fence behind the suspect. The officers then utilized a 40mm Less Lethal Launcher and the suspect was taken into custody. This was marked as ineffective because it didn't wrap and another tool was necessary to take the suspect into custody.

A suspect refused to comply with officers' orders and the BolaWrap was deployed. It missed the suspect. Therefore, it was deemed ineffective.

43.     On this news, the Company's share price fell $2.07, or 25%, close at $6.07 per share on September 23, 2020, thereby damaging investors.

## CLASS ACTION ALLEGATIONS

44.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Wrap securities between April 29, 2020

12

and September 23, 2020, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

45.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Wrap's shares actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of Wrap shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Wrap or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

46.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

47.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

48.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

CLASS ACTION COMPLAINT

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Wrap; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

49.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

50.     The market for Wrap's securities was open, well-developed and efficient at all relevant times.   As a result of these materially false and/or misleading statements, and/or failures to disclose, Wrap's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Wrap's securities relying upon the integrity of the market price of the Company's securities and market information relating to Wrap, and have been damaged thereby.

51.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Wrap's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Wrap's business, operations, and prospects as alleged herein.

52.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial

contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Wrap's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

53.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

54.   During the Class Period, Plaintiff and the Class purchased Wrap's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

55.   As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Wrap, their control over, and/or

15

CLASS ACTION COMPLAINT

receipt and/or modification of Wrap's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Wrap, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
### (FRAUD-ON-THE-MARKET DOCTRINE)

56.    The market for Wrap's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Wrap's securities traded at artificially inflated prices during the Class Period.  On July 17, 2020, the Company's share price closed at a Class Period high of $13.35 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Wrap's securities and market information relating to Wrap, and have been damaged thereby.

57.    During the Class Period, the artificial inflation of Wrap's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Wrap's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Wrap and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

58.    At all relevant times, the market for Wrap's securities was an efficient market for the following reasons, among others:

(a)    Wrap shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Wrap filed periodic public reports with the SEC and/or the NASDAQ;

(c)    Wrap regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)    Wrap was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

59.    As a result of the foregoing, the market for Wrap's securities promptly digested current information regarding Wrap from all publicly available sources and reflected such information in Wrap's share price. Under these circumstances, all purchasers of Wrap's securities during the Class Period suffered similar injury through their purchase of Wrap's securities at artificially inflated prices and a presumption of reliance applies.

60.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All

17

that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

### NO SAFE HARBOR

61.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Wrap who knew that the statement was false when made.

### FIRST CLAIM

**Violation of Section 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder
Against All Defendants**

62.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

63.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i)

deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Wrap's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

64.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Wrap's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

65.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Wrap's financial well-being and prospects, as specified herein.

66.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Wrap's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Wrap and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

19

CLASS ACTION COMPLAINT

67.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

68.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Wrap's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

69.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Wrap's securities was artificially inflated during the Class Period.   In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Wrap's securities during the Class Period at artificially high prices and were damaged thereby.

70.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Wrap was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Wrap securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

71.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

72.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

CLASS ACTION COMPLAINT

## **SECOND CLAIM**

### **Violation of Section 20(a) of the Exchange Act**
### **Against the Individual Defendants**

73.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

74.    Individual Defendants acted as controlling persons of Wrap within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

75.    In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

76.    As set forth above, Wrap and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered

damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.


DATED:  October 15, 2020          **GLANCY PRONGAY & MURRAY LLP**

By:   */s/ Charles H. Linehan*
Robert V. Prongay
Charles H. Linehan
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

CLASS ACTION COMPLAINT

1

**LAW OFFICES OF HOWARD G. SMITH**

2

Howard G. Smith

3

3070 Bristol Pike, Suite 112

Bensalem PA 19020

4

Telephone: (215) 638-4847

Facsimile: (215) 638-4867

5

6

*Attorneys for Plaintiff Paula Earley*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

24

CLASS ACTION COMPLAINT

SWORN CERTIFICATION OF PLAINTIFF

Wrap Technologies, Inc., SECURITIES LITIGATION

I,    Paula Earley                          , certify:

1. I have reviewed the complaint and authorized its filing and/or adopted its allegations.

2. I did not purchase Wrap Technologies, Inc., the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3. I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4. My transactions in Wrap Technologies, Inc., during the class period set forth in the Complaint are as follows:

    See Attached Transactions

5. I have not served as a representative party on behalf of a class under this title during the last three years except as stated:

6. I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

    ☐ Check here if you are a current employee or former employee of the defendant Company.

    I declare under penalty of perjury that the foregoing are true and correct statements.

Dated: _____    10/11/2020

DocuSigned by:

*Paula Earley*

42341EAE871E488...

Paula Earley

**Paula Earley's Transactions in Wrap Technologies, Inc. (WRTC)**

| Date | Transaction Type | Quantity | Unit Price |
|---|---|---|---|
| 7/13/2020 | Bought | 100 | $11.5000 |
| 7/21/2020 | Bought | 400 | $12.4100 |
| 7/22/2020 | Bought | 400 | $10.8000 |
| 8/27/2020 | Bought | 355 | $8.5000 |